UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SARAH J. BURGESS, | ) | CASE NO. 3:13CV295 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Sarah J. Burgess ("Plaintiff"), acting *pro se*, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Child's Insurance Benefits ("CIB"). ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

## I.     PROCEDURAL AND FACTUAL HISTORY

Plaintiff applied for SSI[2] on April 20, 2006, at age eighteen[3], alleging disability since May 1, 1992, due to hypertension, asthma, Attention Deficit Hyperactivity Disorder ("ADHD"), and Asperger's syndrome. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 70-75. Plaintiff requested an administrative hearing, and on August 8, 2008, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, acting *pro se*, and Kathleen Beer, an impartial vocational expert ("VE"). Tr. at 523-544. On December 17, 2008, the ALJ issued a

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]A claimant is entitled to CIB if, among other requirements, the claimant is eighteen years or older and has a disability that began before the claimant reaches his or her twenty-second birthday. 20 C.F.R. § 404.350(a)(5) (2013).  At the time of her application, Plaintiff was receiving Supplemental Security Income benefits ("SSI") under Title XVI of the Act as a disabled child.  Plaintiff's SSI continued until February 1, 2007, when the Commissioner found that she was no longer disabled as of the age of eighteen.

[3]Plaintiff's date of birth is April 10, 1988. Transcript ("Tr.") at 119.

Decision denying benefits. Tr. at 33-40. Plaintiff appealed the Decision, and on July 23, 2010, the Appeals Council granted Plaintiff's request for review and remanded the case to an ALJ for further evaluation of her claim.

Specifically, the Appeals Council instructed the ALJ on remand to: (1) obtain additional information regarding Plaintiff's cardiac and mental impairments; (2) consider the opinions of Plaintiff's treating physicians, as well as the opinions of the State Agency file-reviewing psychologists; (3) consider the third-party statements and their impact on Plaintiff's credibility; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. Tr. at 44.

A second hearing was held on September 1, 2011. The ALJ accepted the testimony of Plaintiff, now represented by counsel, and William Braunig, an impartial vocational expert ("VE"). Tr. at 545-586. On January 18, 2012, the ALJ issued a Decision denying benefits. Tr. at10-27. Plaintiff appealed the Decision, and on December 4, 2012, the Appeals Council denied review. Tr. at 3-6.

On February 8, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 20, 2013, with leave of Court, Plaintiff filed a brief on the merits. ECF Dkt. #14. On September 18, 2013, Defendant filed a brief on the merits. ECF Dkt. #15. No reply brief was filed.

## II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from diabetes, hypertension, asthma, obesity, Asperger's syndrome, pervasive development disorder, ADHD, and depression, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 13. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 ("Listings"). Tr. at 13.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), in that she can lift twenty pounds occasionally and ten pounds frequently, and she can stand and walk for six hours

in an eight-hour workday and does not have any limitations relative to sitting, with the additional limitations that she can only perform simple, routine tasks with only brief public interaction. Tr. at 16. The ALJ ultimately concluded that, although Plaintiff had no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of office helper, routing clerk, and clothing marker. Tr. at 26. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

Plaintiff made an application to provide for the payment of disabled child's insurance benefits payable when a claimant is eighteen years old or older and has a disability that began before attaining the age of twenty-two. 20 C.F.R. §404.350(a)(5). When applying for disability benefits, a claimant has the burden to establish an entitlement to benefits. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir.1992). Because Plaintiff was eighteen when she applied, the disability rules used for adults who file new claims applied to her. 20 C.F.R. §416.924(f).

In reviewing an application, an ALJ must examine the evidence using the five step evaluation process specified by 42 U.S.C. §423 and 20 C.F.R. §404.1520:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). If the claimant can establish an entitlement to benefits at any step, the inquiry ends.

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.    ANALYSIS

Plaintiff advances a single argument in this appeal, that is, she requests a new hearing for the purpose of providing new evidence and testimony. Plaintiff seeks to admit the testimony of her

-4-

current boyfriend and two other friends. Her boyfriend, Amadeus Perez, who authored her brief, writes that his testimony and the testimony of Plaintiff's other two friends will establish that Plaintiff can be very childish and has problems communicating and understanding why other people are upset by the things she does. Perez writes that Plaintiff has frequent temper tantrums and does not take constructive criticism very well. He asserts that Plaintiff's behavior makes her "unpredictable in work and social situations." ECF Dkt. #14 at 3. Finally, Perez relies upon the couples' acquaintances that currently receive SSI to argue that they are "far better functioning than [Plaintiff]" or "are also capable of, and do work themselves." *Id.* at 4.

### A. Hearing testimony

At the hearing, Plaintiff testified that she was residing at her mother's house, Tr. at 550, but she was not certain whether her mother was working. Tr. at 551. Plaintiff further testified that she was receiving food stamps and that she had medical insurance. Plaintiff attended special education classes in high school and received A's and B's. Tr. at 554. Plaintiff began attending Owens Community College ("Owens") in 2006, where she was granted special accommodations based upon her developmental problems. She received an associates degree in accounting. Plaintiff needed five years to complete the two-year program, because she failed a few math classes and had to take Intermediate Accounting II twice.

She explained at the hearing that she suffered from a lot of stress due to her home situation. Tr. at 555. Plaintiff had problems with her mother's alcohol consumption as well as problems with her mother'boyfriend. Plaintiff moved to her grandmother's home for roughly a year, but returned to her mother's home when her grandmother could no longer afford to keep her. At the time of the hearing, Plaintiff was pursuing a second degree from Owens in marketing. Tr. at 556. She testified that she was always a full-time student and that she traveled back and forth to school on public transportation.

Plaintiff aspired to living on her own or with a boyfriend or husband. Tr. at 557. She testified that she would like to be of service to her community. However, Plaintiff conceded that her social skills "aren't the best in the world." Tr. at 558. She is talkative, she has ADHD, and she was

recently diagnosed with depression. She has difficulty expressing herself and her family tells her that she has "behavioral problems" and "anger management problems." Tr. at 558-559.

Plaintiff is diabetic and needs to eat during the day to maintain her blood sugar levels. She also believed that she was going to be diagnosed with PMDD, which she described as a "higher form of PMS." Tr. at 560. At the time of the hearing, she was prescribed Metformin and Clonidine for her diabetes, Symvastatin (a generic form of Zocor) for her high cholesterol, sertraline (a generic form of Zoloft), Trazadone, and Risperdidone for her depression, Ritalin for her ADHD, and Singulair and Albuterol for her asthma. Tr. at 561-566. When asked about side effects, Plaintiff acknowledged that some of her medications commonly caused drowsiness and dizziness, but that she did not experience those side-effects. Tr. at 567. However, she believed that her medications did suppress her appetite. Plaintiff testified that she is five feet tall and weighs 160 pounds. Tr. at 562. Despite applying for jobs, Plaintiff testified that she has never been employed. Tr. at 552. She had recently applied for a job as a computer lab assistant at Owens, but she was not hired. Nonetheless, Plaintiff has had volunteer jobs. Tr. at 559. She is the marketing chair for the student government association at Owens, and, since 2006, Plaintiff takes attendance every Sunday for the junior church, Sunday school, and the adult classes and enters the information on the computer. Tr, at 559-560.

Plaintiff testified that she can lift ten pounds frequently, and has no limitation with respect to walking and standing. Tr. at 567-568. When the ALJ asked Plaintiff if she believed that she could maintain full-time employment after she receives her marketing degree from Owens, Plaintiff responded that she "probably" could if she had transportation. Tr. at 577. Plaintiff testified that she "practically live[s]" at Owens. Tr. at 577. She conceded that she is able to maintain her concentration during classes when she takes her medication. Tr. at 580. Her classes range from one and a half hours to two hours in length. Tr. at 580.

At the hearing, the ALJ asked Plaintiff about her treatment with "Dr. Biggem." Tr. at 568. The ALJ appears to refer to the advanced nurse practitioner at Harbor Behavioral Healthcare, David Bingham. Tr. at 513. Plaintiff explained that she had only seen Mr. Bingham a few times and that she talked with him about her social problems with her friends and at home. Tr. at 569. She testified

-6-

that she had difficulty maintaining romantic relationships and friendships. Tr. at 578. Despite Plaintiff's anger management problems, she has never hit anyone, although she did recall assaulting someone when she was much younger, prior to being prescribed medicine for her mental problems. Tr. at 579.

Specifically, the ALJ asked Plaintiff about Mr. Bingham's treatment notes, which reflected that Plaintiff's impulse control had improved in January of 2011, but that her impulse control had worsened in August of that same year. Tr. at 570. Plaintiff explained that "a lot of stuff kind of happened during the summer that just made [her] really depressed," including the end of a romantic relationship. She testified that she tried to remain friends with the former boyfriend, but that only served to prolong her heartbreak Tr. at 571. The ALJ commented that, during the time that Plaintiff was treating with Mr. Bingham, she demonstrated good judgment when she broke up with a boyfriend who assaulted her and when she moved from her mother's residence when her mother's alcohol consumption became an increased strain on their relationship. Tr. at 573.

### B. Medical history

Plaintiff has a history of developmental problems, thought to have been the result of a head injury sustained when Plaintiff fell two stories and suffered a brain bruise when she was a toddler. Tr. at 160-162. There are scattered references to Plaintiff's childhood injury throughout the record, but no medical records relating to the injury.

Mark D. Hammerly, Ph.D., a licensed psychologist, performed a consultative evaluation of Plaintiff on September 11, 2006. Tr. at 172-81. Dr. Hammerly acknowledged that Plaintiff was not working and relied upon disability payments for support, and that she appeared for the purpose of "her mandatory recheck upon turning [eighteen]." Tr. at 172.

At that time, Plaintiff reported having only a few friends, a lifelong problem she attributed to her difficulty with communication and socialization, but had just began studying accounting at a local technical college. Tr. at 173. She further reported that she graduated from high school in 2006, that she was in special education classes, and that the disability office at the college that she was attending granted her special allowances to account for her learning disabilities. Plaintiff explained that she had attended bi-weekly counseling sessions at Harbor Behavior, which she started

-7-

due to family problems related to her pervasive development disorder diagnosis. Tr. at 174. Her mother added that Plaintiff discontinued her treatment when she reached "a plateau." Tr. at 174. At the time, Plaintiff was prescribed Ritalin, Diovan, Clonidine, Singulair, Motrin, Depoprovera, and Albuterol. Tr. at 174.

A mental status examination revealed that she was cooperative and friendly, although her speech patterns were "quite childlike and made her seem younger than her stated age." Tr. at 175. Her thought processes were logical. Tr. at 175. Cognitive testing showed that her mental control, concentration, and memory were grossly intact. Tr. at 176. Plaintiff reported that her daily activities included going to school, doing chores, and checking her email on the computer. Tr. at 177. Her hobbies included drawing, doing puzzles, and playing video games. Tr. at 177. Dr. Hammerly diagnosed Plaintiff with Pervasive Developmental Disorder, NOS, and Dyssomnia, NOS.[4] Tr. at 178-79. He concluded that Plaintiff had a moderate impairment in her ability to relate to others; understand, remember, and follow instructions; and withstand the stress and pressure of daily work activity; but no impairment in her ability to maintain attention, concentration, persistence, or pace to perform simple, repetitive tasks Tr. at 179.

Plaintiff also has a history of medical treatment for asthma, diabetes, and hypertension. Plaintiff was diagnosed with asthma when she was in the sixth grade. Tr. at 365. Maria Rojeski, M.D., an endocrinologist, evaluated Plaintiff on November 9, 2007 for a lipid disorder related to insulin resistance. Dr. Rogeski opined that the lipid disorder was exacerbated by treatment with Depo-Provera, a contraceptive also taken by Plaintiff for the purpose of mood stabilization. Tr. at 244-48. Dr. Rogeski characterized Plaintiff as "a most complex case with an increased cardiovascular risk, although we can never know how much that is." Tr. at 247. She explained to Plaintiff and her mother that progesterone-only contraceptives dramatically alters cardiovascular risk and may cause osteoporosis. Tr. at 247.

---

[4]Plaintiff told Dr. Hammerly that she retires at 10:00 p.m. and sleeps for four or five hours and then gets something to eat. She described this problem – "waking up every three hours for something to eat" – as existing since she was a child. Tr. at 176-177.

At the time, in addition to Depo-Provera, Plaintiff was prescribed Ritalin and Clonidine to treat her ADHD and Asperger's syndrome, and Singular and Albuterol to treat her asthma. Clonidine is also prescribed to treat hypertension. Tr. at 245. Dr. Rojeski prescribed a statin medication, to lower Plaintiff's cholesterol, and Metformin, for treatment of her insulin resistance. Tr. at 247. Despite her concerns, Dr. Rogeski did not recommend discontinuation of Depo-Provera, but, instead, chose to continue the medication and scheduled a follow-up appointment in three months to determine whether the prescribed medication was effective.

Joseph Thompson, M.D., who treated Plaintiff at Mercy Health Partners, documented on November 13, 2009 that Plaintiff's diabetes, ADHD, hypertension, and Asperger's syndrome were stable on medication and she experienced no side effects. Tr. at 304. He also indicated that Plaintiff was doing well with respect to her Asperger's syndrome and was a junior in college, where she studied accounting. Tr. at 304. Subsequent progress notes show that on January 18, 2010, Plaintiff was non-compliant with her diabetes medication. Tr. at 298. However, in June of 2010, her hypertension was well controlled, and her ADHD was stable with Ritalin. Tr. at 296. By January of 2011, her hypertension and diabetes were both well-controlled. Tr. at 282.

Sushil M. Sethi, M.D., performed a consultative examination of Plaintiff on September 15, 2011. Tr. at 365-73. At that time, Plaintiff was taking courses towards an associate's degree in marketing. Tr. at 365. She reported that she did well in school and enjoyed her classes. Tr. at 365. She also enjoyed computers and computer programming. Tr. at 365. She said that she had applied for many jobs, but had not been hired. Tr. at 365.

Plaintiff explained that she had been diagnosed with asthma when she was in the sixth grade, but that she did not currently use an inhaler. Tr. at 365. At the time, she was prescribed Ritalin, clonidine, Singular, trazadone, sertraline, Metformin, and simvastatin. Tr. at 366. Plaintiff's physical examination revealed normal results. Tr. at 366. A neurologic examination showed a lack of rhythm and an odd reflection in her speech, which Plaintiff identified as the reason she had difficulty finding employment. Tr. at 367. Dr. Sethi diagnosed depression, ADHD, Asperger's syndrome, type 2 diabetes, asthma (under control), hypertension, and moderate obesity. Tr. at 367.

-9-

Dr. Sethi indicated that Plaintiff's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, handling objects, and traveling may be moderately limited due to her Asperger's syndrome and difficulties with social interaction. Tr. at 367. However, she would be able to perform the requirements of up to medium work, lifting up to fifty pounds occasionally. Tr. at 374-79. Plaintiff would also be able to shop, travel without a companion, use public transportation, prepare a simple meal, feed herself, care for her personal hygiene, and sort, handle, and use paper/files. Tr. at 379.

Valarie Stricklen, M.D., Plaintiff's pediatrician since 2003, treated her more recently from January 2006 to August 2009. Tr. at 413-40. Progress notes from January of 2006 show that Plaintiff's mother reported "no concerns." Tr. at 439. In July of 2006, Plaintiff was "doing well" and again, her mother reported "no concerns." Tr. at 437. In October of 2007, a nurse practitioner noted that Plaintiff's ADHD medication appeared to be working well. Tr. at 429. In January of 2008, Dr. Stricklen noted that Plaintiff was a sophomore at Owens, was earning A's and B's, and was "doing well overall." Tr. at 426-27.

On August 5, 2008, Dr. Stricklen recorded in her progress notes that Plaintiff was taking accounting courses at Owens, was struggling with her grades, especially with Algebra, and that Social Security was "trying to cut her off." Tr. at 423. She also noted that Plaintiff's mother reported "no concerns" and that Plaintiff was "very stable." Tr. at 423. Dr. Stricklen concluded that Plaintiff's ADHD was "very stable" and advised her to return in six months. Tr. at 424.

That same day, Dr. Stricklen drafted a "To Whom It May Concern" letter stating that Plaintiff was unable to be gainfully employed. Tr. at 251. Dr. Stricklen opined that Plaintiff's ADHA, Asperger's syndrome, and Developmental Delay make it difficult for her to function on her own, without supervision from her mother. She noted that Plaintiff was a student at Owens and was struggling to keep her grades above failing, even though she was only taking twelve credit hours. Tr. at 251. Dr. Stricklen further opined that Plaintiff would require extensive training and supervision, far beyond that of a person without her diagnoses.

When Plaintiff returned to Dr. Stricklen in November of 2008, her mother reported "no concerns." Tr. at 421-22. In August of 2009, Plaintiff reported no side effects from her medication.

Tr. at 413) She was experiencing increased stress, but was "handling it ok." Tr. at 413. Her mother was concerned that she was still aggressive, but otherwise reported no problems. Tr. at 413.

Plaintiff sought an evaluation from Harbor Behavioral Healthcare on December 6, 2010, for use at her Social Security hearing. David Bingham, a clinical nurse specialist, performed an initial psychiatric evaluation. Tr. at 348-353. Plaintiff reported that she was in the process of ending her relationship with her boyfriend and that she became angry when she was depressed. Tr. at 348-349. Mr. Bingham diagnosed her with an impulse-control disorder and a depressive disorder, and he assigned a global assessment of functioning ("GAF") score of sixty[5], indicating only moderate symptoms. Tr. at 351-352.

In a medication management visit on January 4, 2011, Mr. Bingham indicated that Plaintiff's attention and concentration were intact. Tr. at 513. He again assigned a GAF score of sixty. Tr. at 513. At the time, Plaintiff was busy preparing to return to college the following week and felt that her medication was working well. Tr. at 336.

Also on January 4, 2011, after treating Plaintiff on two occasions, Mr. Bingham completed a mental residual functional capacity assessment in which he indicated that Plaintiff had responded well to medication and had experienced improvement in impulse control. Tr. at 265-270. He assessed Plaintiff with mild to no limitations in her ability to understand, remember, and carry out short, simple instructions; perform activities within a schedule; be punctual; perform at a consistent pace; ask simple questions; and accept instructions. Tr. at 265-266. He assessed Plaintiff with moderate limitations in her ability to sustain an ordinary routine, make judgments on complex decisions, complete a normal workweek, respond to criticism, tolerate work stress, adhere to standards of neatness, and respond to usual work situations. Tr. at 265-266. He assessed Plaintiff with marked limitations in her ability to interact with the general public or co-workers, maintain socially

---

[5]A GAF score is a rating of overall psychological functioning on a scale of zero to one hundred. A score of fifty-one to sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).

-11-

appropriate behavior, travel in unfamiliar places, set realistic goals, and work in coordination with others. Tr. at 265-266.

Treatment records from March 4, 2011 show that Plaintiff had stopped taking her medication for a short while, which led to an exacerbation of her depression. Tr. at 339. She had just ended another romantic relationship, and was experiencing stress about school and money. She appeared sad at a return visit on May 13, 2011, but she was cooperative and her attention and concentration were intact. Tr. at 343-344.

On August 18, 2011, Mr. Bingham completed a second form to assess Plaintiff's mental functioning. Tr. at 354-55. On this form, he concluded that Plaintiff had moderate limitations in her ability to understand, remember, and carry out simple instructions, and respond appropriately to usual work situations. Tr. at 354-55. As before, he concluded that Plaintiff had marked limitations in areas of functioning related to interacting with the public, supervisors, and co-workers. Tr at 354-55. Mr. Bingham noted that Plaintiff had poor impulse control and lacked an understanding of appropriate boundaries. Tr. at 355.

Daniel K. Watkins, Ph.D., a psychologist, performed a consultative psychological evaluation of Plaintiff on September 12, 2011. Tr. at 380-90. Dr. Watkins indicated that Plaintiff performed self-care skills independently, had computer and internet skills, and was enrolled full-time at a community college where, she reported, she has been "fairly successful" in her studies. Tr. at 383. Plaintiff reported that she was able to manage money and engage in household chores such as cooking, vacuuming, doing the laundry, and washing dishes. Tr. at 383. She had age-appropriate friends, was interested in Anime[6], and hoped to attend an Anime convention with her friends in the future. Tr. at 383. She presented as appropriately groomed, but acted in a manner consistent with a younger person. Tr. at 383. Her attention and concentration were adequate for the evaluation. Tr. at 384.

Dr. Watkins concluded that Plaintiff appeared to be interested in other people and did not appear to exhibit a marked impairment in the use of non-verbal behavior to regulate social

---

[6]Anime are Japanese animated productions usually featuring hand-drawn or computer animation.

interaction. Tr. at 386. Plaintiff did not lack social reciprocity and displayed some interest in a reciprocal social life. Tr. at 386. Dr. Watkins concluded that Plaintiff's attention and concentration were adequate for the purposes of an ordinary eight-hour day. Tr. at 386. Plaintiff had no limitation in her ability to maintain attention and concentration to perform simple tasks. Tr. at 387. She would have moderate difficulty in her ability to respond appropriately to supervision and to co-workers due to her immaturity. Tr. at 387. Although she might require greater supervision initially, Dr. Watkins expected Plaintiff to improve as she got older and gained workplace experience. Tr. at 387. Finally, due to her mood disorder, Dr. Watkins opined that Plaintiff might have moderate limitations in her ability to respond appropriately to work pressures, but she should be able to cope adequately in a low or moderate pressure work setting. Tr. at 387.

### C.     Third-party statements

In addition to the medical evidence in the record and the testimony received at the hearing, the ALJ also considered written statements offered by three of Plaintiff's friends and a friend of Plaintiff's mother. In his letter, David McCoy wrote that he had known Plaintiff for many years and that she could not hold a job even with training. Based upon Plaintiff's behavior at home and in social situations, McCoy wrote that it takes a lot of patience to deal with her. Tr. at 234. Rebecca Zawodni was also a friend of Plaintiff for many years and she wrote that Plaintiff did not have the appropriate skills to work and deal with the general public. Tr. at 252. Dawn Lerma agreed, writing that Plaintiff would struggle to work with the rude public. Tr. at 254. Tracey Beyer, who watched Plaintiff for a week when she was seventeen years old, wrote that Plaintiff threw temper tantrums, wanted toys more appropriate for a nine-year-old child, and constantly defecated in her underwear. Tr. at 253. Ms. Beyer further wrote that, when she gave Plaintiff the opportunity to work in her flower shop, Plaintiff became frustrated and threw a temper tantrum.

### D.     The ALJ's decision

In reaching the conclusion that Plaintiff was capable of full-time work, the ALJ rejected the opinions of Plaintiff's treating physician, Dr. Stricklen, who opined that Plaintiff was incapable of keeping a full time job, and Mr. Bingham, who concluded that Plaintiff had marked impairments in

-13-

her ability to deal with the public and interact appropriately with coworkers without unduly distracting them or exhibiting extreme behaviors.

The ALJ articulated several reasons for giving little weight to the opinions of Dr. Stricklen and Mr. Bingham. First, the ALJ correctly asserted that Plaintiff's ability to work is an issue reserved to the Commissioner. She also correctly asserted that nurse practitioners are not accepted medical sources pursuant to the Social Security regulations. Finally, the ALJ opined that the opinions of Dr. Stricklen and Mr. Bingham were inconsistent with other substantial evidence in the record. The ALJ simply could not resolve the dire projections provided by Dr. Stricklen and Mr. Bingham with Plaintiff's accomplishments at Owens and her activities both on and off campus. The ALJ wrote, "[Plaintiff] has been able to successfully attend school and engage in functions such as keeping attendance records for her church and creating flyers for Owens. She is also active in gaming and Anime activities with her friends." Tr. at 23. Further, the ALJ relied upon intelligence testing in the record, which yielded a full scale IQ score of 95. Tr. at 23.

The ALJ also found that Mr. Bingham's conclusions regarding Plaintiff's impulse control and her ability to set boundaries were not supported by the record. The ALJ restated her comments at the hearing, where she complimented Plaintiff's decisions to break up with an abusive boyfriend and to leave her mother's residence when issues arose surrounding her mother's drinking and her boyfriend. Tr. at 24.

Moreover, the ALJ observed that Plaintiff's behavioral problems were circumscribed to the home and her personal relationships. Her behavioral problems never appeared to arise at Owens, as the record does not include any reference to incidents at the college. The ALJ wrote, "While [Plaintiff] has received accommodations [at Owens], none of the accommodations were related to behavioral issues." Tr. at 24.

Finally, the ALJ observed that the various GAF scores assigned to Plaintiff, including those assigned specifically by Mr. Bingham, were inconsistent with his extreme conclusions. Throughout the record, Plaintiff was assigned GAF scores in the fifty-one to sixty range. Scores in that range typically reflect moderate symptoms and moderate limitations. Tr. at 24. Further, the ALJ cited *Smith v. Commissioner of Social Sec.,* 482 F.3d 873 (6th Cir.2007) for the proposition that Plaintiff's

-14-

GAF scores support the conclusion that she is capable of full-time work. *Id.* at 877 ("Even assuming GAF scores are determinative, the record supports a GAF in the high 40s to mid 50s, which would not preclude her from having the mental capacity to hold at least some jobs in the national economy.")

Instead, the ALJ gave great weight to the opinions of Drs. Hammerly and Watkins, who concluded that Plaintiff is capable of performing work involving simple, routine tasks. Tr. at 24. However, the ALJ gave less weight to the opinions of Drs. Hammerly and Watkins that Plaintiff is moderately restricted in her ability to interact appropriately with coworkers or supervisors, since those conclusions were not supported by the record. The ALJ wrote, "There is no evidence that [Plaintiff] has been unsuccessful or has had difficulty interacting with her teachers/instructors or the members of Owens government board where she provided marketing assistance. Further, there is no evidence that she had problems with the individuals assisting her in note taking. However, due to her testimony that she sometimes has to explain herself to people and the finding that she is immature and unsophisticated, she is limited to only brief public interaction." Tr. at 25.

With respect to the third-party statements, the ALJ gave them some weight. The ALJ wrote that the third-party statements reflected that Plaintiff has "some limitations" and that the statements "provide insight into [Plaintiff's] abilities and restrictions." Tr. at 25. She further wrote that the statements had been considered in the ascertaining of Plaintiff's RFC.

### E. Sentence Six remand

Sentence six of § 405(g) addresses situations where a claimant submits new evidence that was not presented to the ALJ but that could alter the ALJ's ultimate decision. Sentence six of §405(g) provides, in relevant part:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both . . . .

42 U.S.C. § 405(g).

-15-

A "sentence six" remand is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir.2010). Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id.* "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001). "The party seeking a remand bears the burden of showing that these [ ] requirements are met." *Hollon ex rel. Hollon v. Comm'r of Social Security*, 447 F.3d 477, 483 (6th Cir.2006). Courts "are not free to dispense with these statutory requirements." *Hollon*, 447 F.3d at 486.

To show good cause a claimant is required to detail the obstacles that prevented him from entering the evidence in a timely manner. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Commissioner of Social Security*, 479 Fed. Appx. 713, 725 (6th Cir.2012). The Sixth Circuit "takes a harder line on the good cause test' with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.' " *Id.*, quoting *Oliver v. Secretary of Health & Human Services*, 804 F.2d 964, 966 (6th Cir.1986).

In a sentence-six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

" 'Good cause' is shown for a sentence-six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.' " *Payne v. Comm'r of Soc. Sec.*, No. 1:09–cv–1159, 2011 WL

-16-

811422, at * 12 (W.D.Mich. Feb.11, 2010) (finding that evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

The undersigned recommends that the Court find that a sentence six remand is not appropriate in this case. First, the additional testimony would be cumulative to the extent that there are third-party statements in the record that illustrate Plaintiff's behavior at home and in social situations. As a consequence, even assuming that the testimony is new, that is, that it could not have been offered at the September 1, 2011 hearing, it is unlikely to change the ALJ's disability determination. The ALJ relied upon Plaintiff's achievements at Owens and her performance of other work at her church in concluding that she is capable of full–time work. The ALJ found that Plaintiff's problem behavior was limited to social situations and at home. Moreover, the additional testimony does not result from continuing medical treatment, but, instead, is more appropriately characterized as having been "generated merely for the purpose of attempting to prove disability." *Payne, supra.* Accordingly, the undersigned recommends that the Court find that additional evidence regarding her interpersonal relationships does not constitutes new and material evidence sufficient to support a sentence six remand.

### F.     The treating physician rule

Although Plaintiff did not challenge the ALJ's application of the treating physician rule, the undersigned believes that the Court should nonetheless consider the rule and its application in this case. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

-17-

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the

-18-

treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377.

Here, as previously stated, the ALJ gave little weight to Dr. Stricklen's opinion that Plaintiff was unable to perform full-time work. However, having reviewed the record, the undersigned recommends that the Court find that the ALJ properly applied the treating physician rule. The ALJ clearly articulated her reasons for attributing little weight to Dr. Stricklen's opinion. Dr. Stricklen's opinion was conclusory in that her treatment notes did not provide adequate support for her opinion. In fact, the very day that she completed her "To Whom It May Concern" letter, her treatment notes reflect that Plaintiff was doing well. Likewise, Dr. Stricklen's opinion is at odds with Plaintiff's performance at Owens. Plaintiff has been a student at Owens since 2006 and testified that she "practically live[s]"there, Tr. at 577, yet there is no evidence in the record that Plaintiff has had any outbursts at school. Moreover, to the extent that the ALJ discredited the opinions of Dr. Stricken and Mr. Bingham, she nonetheless limited Plaintiff to simple, routine tasks with brief exposure to the public. As a consequence, the undersigned recommends that the Court find no violation of the treating physician rule.

### VI. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint with prejudice.

DATE: February 27, 2014

                                */s/George J. Limbert*
                                GEORGE J. LIMBERT
                                UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).